IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES MUNDO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 20 C 2562 |
| v. ) | |
| ) | Judge John Z. Lee |
| CITY OF CHICAGO and ) | |
| JANIC HOGAN, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

As a gay and gender-nonconforming man, Plaintiff James Mundo apparently does not fit the Chicago Fire Department's ("CFD") dominant stereotype for male employees. As a result, Mundo alleges in this action that he was subjected to pervasive harassment and discrimination by his direct superior, Janice Hogan, while working for the CFD's Labor Relations Division from 2016 to 2018. Based on that alleged conduct, Mundo brings claims against Hogan and the City of Chicago ("the City") under Title VII, 42 U.S.C. § 1983, and the Illinois Gender Violence Act. Before the Court is the City's motion to dismiss the § 1983 and IGVA counts with prejudice as to itself. For the reasons set forth below, the motion is granted in part and denied in part.

I. **Background**[1]

James Mundo was hired by the CFD as a firefighter in August 2006. Am. Compl. ¶ 6, ECF No. 31. It was at the firehouse that Mundo first experienced the CFD's pervasive "anti-gay" environment, *id.* ¶ 42, which was characterized by a dominant "heterosexual mentality" to which other male firefighters were expected to conform. *Id.* ¶¶ 37–38. As a male firefighter who did not conform to this mentality, Mundo was subjected to frequent acts of discrimination and harassment during the two years he worked at the firehouse. *Id.* ¶¶ 6, 14.

In January 2008, Mundo was transferred to the Internal Affairs Division, where he worked until January 2013. *Id.* ¶ 7. Mundo then was assigned to work in the Labor Relations Division, under the direct supervision of Hogan, Deputy Chief of Administrative Services. *Id.* ¶¶ 8–9.

Hogan, a heterosexual female, shared the dominant mentality that Mundo had witnessed at the firehouse and expected all male employees to conform to her vision of a heterosexual, masculine firefighter. *Id.* ¶¶ 11–13. But Mundo, whom Hogan knew to be gay and married to another man, did not conform to the stereotype that Hogan and others in the CFD preferred. *Id.* ¶¶ 14–16. As a result, Hogan believed that Mundo needed to be "straightened out" to align with her preferred stereotype. *Id.* ¶ 17. To achieve that goal, Hogan considered it acceptable to treat Mundo differently than other male CFD employees on account of his sexual orientation and gender non-conformity. *Id.* ¶¶ 18, 21.

---

[1] The Court "accept[s] as true all well-pleaded facts alleged" in the complaint when reviewing a motion to dismiss. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

Between 2016 and 2018, Hogan subjected Mundo to dozens of acts of sexual harassment and discrimination, including:

- Undressing in front of Mundo, directing him into her office while she was undressed, and exposing her breasts to him, *id.* ¶ 19(b), (j), (p);

- Asking him if his husband would mind if they had sex, *id.* ¶ 19(c);

- Referring to another firefighter as a "faggot" in his presence, *id.* ¶ 19(d);

- Asking him to masturbate in front of her, *id.* ¶ 19(g);

- Mocking "people claiming sexual harassment," *id* ¶ 19(o); and

- Telling him she was sure he did not have any gag reflex, *id.* ¶ 19(cc).

Mundo repeatedly complained of Hogan's offensive conduct to her, but she was unmoved, viewing him as her "gay plaything" with whom she "could do whatever she wanted" without fear of discipline. *Id.* ¶ 19(dd). She even threatened to send Mundo "back in the field," where he would likely experience even greater harassment, if he did not go along with her behavior. *Id.* ¶¶ 19(ee), 26, 44. Although Mundo reported some incidents of Hogan's harassment to the CFD's Assistant Commissioner of Internal Affairs, he hesitated to report them all due to her threats. *Id.* ¶¶ 25–26.

Hogan's persistent harassment caused Mundo to suffer from anxiety, panic disorder, post-traumatic stress disorder, and depression. *Id.* ¶ 27. He has been on medical leave of absence due to those conditions since October 2018. *Id.* ¶ 28.

Mundo filed this action in April 2020, alleging four counts: (1) discrimination pursuant to Title VII against Hogan and the City; (2) violation of equal protection pursuant to 42 U.S.C. § 1983 against Hogan; (3) violation of equal protection pursuant

3

to § 1983 against the City; and (4) violation of the Illinois Gender Violence Act by Hogan and the City. *See* Compl., ECF No. 1. The City previously moved to dismiss Counts III and IV, but the motion was stricken after Mundo indicated a desire to file an amended complaint. Believing that the amended counts suffer from the same deficiencies, the City has renewed its motion to dismiss the new Counts III and IV under Rule 12(b)(6). *See* Def. City's Mot. Dismiss ("Mot."), ECF No. 32.

## II.   Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (cleaned up).

Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Moreover, while courts "must take all of the factual allegations in the complaint as true" for purposes of a motion to dismiss, they are "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim under Rule 12(b)(6). *Iqbal*, 556 U.S. at 678

### III. <u>Analysis</u>

The City moves to dismiss Counts III and IV, arguing that it cannot be held liable under § 1983 or the IGVA. The Court takes each count in turn.[2]

**A.  Count III**

In challenging the sufficiency of Mundo's § 1983 claim, the City argues that he has not established municipal liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Under *Monell*, "a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.* at 691. Instead, for a municipality to be held liable, a plaintiff must allege that an official policy of the municipality itself was the driving force behind his or her injury. *Id* at 694. "A plaintiff can establish on official policy through (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Teesdale v. City of Chi.*, 690 F.3d 829, 833–834 (7th Cir. 2012) (cleaned up).

---

[2] The City also makes two arguments that the Court need not address. First, the City contends that Count III is untimely to the extent it is premised on discrimination that Mundo allegedly suffered while working as a firefighter from 2006 to 2008. *See* Am. Compl. ¶ 42. But in his response brief, Mundo clarified that this allegation was provided only as context for Hogan's alleged threat to send him "back in the field," *see id.* ¶ 19(ee), not as an independent basis for Count III. Second, the City moves to dismiss Mundo's prayers for punitive damages against the City in Counts I, III, and IV, *see id.* ¶¶ 65, 85, 93, on the ground that municipalities may not be assessed punitive damages, *see City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Conceding this point, Mundo withdraws his requests for punitive damages against the City in his responsive brief.

Here, Mundo concedes that there was no express policy authorizing the alleged misconduct by Hogan. On the contrary, the complaint acknowledges that the CFD has "adopted written policies that . . . prohibit discrimination or harassment on the basis of sex." Am. Compl. ¶ 43. Nor does Mundo maintain that Hogan was acting as a person with final policymaking authority when she committed the alleged acts at issue.

Instead, Mundo grounds his claim on the existence of a "long-standing" custom or practice within the CFD of "allow[ing] its members to embarrass, humiliate, ostracize, diminish, [and] discriminate" against gay and gender-nonconforming firefighters, notwithstanding its written policies to the contrary. *Id.* ¶ 41. Although the complaint does not describe the precise contours of this alleged custom or practice, the main theory seems to allege the failure to "train, supervise, and discipline" CFD employees "so as to prevent civil rights violations of the[ir] LGBT+ and gender-nonconform[ing]" male colleagues. *See id.* ¶ 40. Put differently, Mundo posits that the CFD's failure to enforce its express written policies of *prohibiting* discriminatory behavior has allowed it to flourish, resulting in an "underbelly of discrimination against gay male firefighters" by employees, like Hogan, who face little risk of repercussions. *Id.* ¶ 35; *see also id.* ¶¶ 39, 43.

The City contends that Mundo has not plausibly established the existence of any such custom or practice because he "failed to allege any instances of [it] other than his own isolated experiences," citing *Daniel v. Cook Cty.*, 833 F.3d 728, 735 (7th Cir. 2016)). Mot. at 6. But the City makes too much of this one sentence in *Daniel*.

6

As the Seventh Circuit has recognized, "there is no clear consensus as to how frequently [a widespread custom or practice] must occur to impose *Monell* liability." *Thomas*, 604 F.3d at 303 (cleaned up). The only hard and fast rule (to the extent one exists) is that "it must be more than one instance, or even three." *See also Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003) ("When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference."); *Jackson v. Marion Cty.*, 66 F.3d 151, 152 (7th Cir. 1995) ("[P]roof of a single act of misconduct will not suffice; for it is the series that lays the premise of the system of inference."); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality op.) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* . . . .").

Moreover, a plaintiff need not necessarily identify "every other or even one other individual" who has been affected by the alleged custom or practice, *see White v. City of Chi.*, 829 F.3d 837, 844 (7th Cir. 2016), so long as he or she presents a series of bad acts from which a trier of fact can "infer from them that the policymaking level of government was bound to have noticed what was going on." *Jackson*, 66 F.3d at 152. Mundo satisfies that pleading burden here.

Indeed, the complaint alleges not just a few, but dozens of instances of sexual harassment by Hogan, one of the CFD's chief administrative officers, occurring constantly over course of several years. It alleges that Hogan acted without fear of discipline and that Mundo's complaints about her behavior did little to change it. It

7

alleges that Hogan's own superiors engaged in heteronormative banter as well, making such behavior "fair game for the regimen." Am. Compl. ¶ 37. Along the same lines, it alleges that sexual harassment at the firehouses was so well-known that Hogan threatened to send Mundo back there if he did not tolerate her behavior. These allegations, if taken as true, would establish that "sexual harassment was the general, on-going, and accepted practice at the [] Fire Department" and that CFD policymakers "knew of, tolerated, and participated in the harassment." *See Bohen v. City of E. Chi.*, 799 F.2d 1180, 1189 (7th Cir. 1986) (finding for plaintiff on § 1983 claim against the City of East Chicago based on pervasive sexual harassment at the East Chicago Fire Department); *see also* Am. Compl. ¶¶ 45–49.[3]

The City's suggestion that Mundo fails to allege a widespread practice or custom of the City as opposed to the CFD also is unpersuasive. Granted, in *Latuszkin v. City of Chicago*, the Seventh Circuit drew a distinction between policies and customs "of the City" and those "of the CPD," or the Chicago Police Department. 250 F.3d 502, 505 (7th Cir. 2001). But, in *Latuszkin*, the City was the sole defendant. By contrast, in cases where the plaintiff has sued both the municipality and its fire department, the Seventh Circuit often has lumped them together for purposes of § 1983. *See Bohen*, 799 F.2d at 1189 ("[I]t is clear that Bohen has an actionable § 1983 claim against all defendants, including the fire department and the City of East

---

[3] By contrast, in *Daniel*, the plaintiff's *Monell* claim was based solely on the treatment that he received (or failed to receive) to address a single wrist injury that he received while playing basketball at his correctional facility. 833 F.3d at 730. This was "his own isolated experiences" to which the court referred in its opinion. *See id.* at 735.

Chicago."); *see also Garrison v. Burke*, 165 F.3d 565, 572 n.5 (7th Cir. 1999) (equating the cities of East Chicago and Rockford with their respective fire departments).[4]

For these reasons, the City's motion to dismiss Count III is denied.

**B.   Count IV**

Next, the City moves to dismiss Count IV on the grounds that a municipality cannot be liable as a "person" under the Illinois Gender Violence Act ("IGVA"). In relevant part, that statute provides that "[a]ny person who has been subjected to gender-related violence . . . may bring a civil action for damages, injunctive relief, or other appropriate relief against a person or persons perpetrating that gender-related violence." 740 Ill. Comp. Stat. 82/10. "For purposes of this Section, 'perpetrating' means either personally committing the gender-related violence or personally encouraging or assisting the act or acts of gender-related violence." *Id.*

Pointing to this Court's recent decision in *Robinson v. FedEx Ground Package System, Inc.*, the City argues that it is not a proper defendant under the IGVA because it is not a "person" within the meaning of the IGVA. No. 19 C 1717, 2020 WL 586866, at *3–4 (N.D. Ill. Feb. 6, 2020). Indeed, as the Court explained in *Robinson*, every district court so far "to squarely address this issue has decided that the IGVA does not apply to corporations." *Id.* at *3 (citing *Rosas v. Komatsu Am. Corp.*, No. 18 C 1120, 2018 WL 3758564, at *2 (C.D. Ill Aug. 8, 2018) ("District courts that have

---

[4]   Furthermore, courts in this district have held that the City is the *only* proper defendant in an action based on alleged policies of the CFD, given that the latter "is not a legal entity separate from the City." *See Gomez v. City of Chi.*, No. 16 C 7743, 2017 WL 131565, at *3 (N.D. Ill. Jan. 13, 2017) (quoting *Stevanovic v. City of Chi.*, 896 N.E.2d 355, 356 (Ill. App. Ct. 2008). It would be odd to insulate the City from liability when it is the only proper party.

9

explicitly considered the issue of whether an entity, as opposed to a natural person (human being), can be sued for violating the IGVA have all concluded that such suits against entities cannot be maintained."); *Fuesting v. Uline, Inc.*, 30 F. Supp. 3d 739, 743–44 (N.D. Ill. 2014) (collecting cases)). While two district courts have allowed IGVA claims against corporations to proceed, neither addressed this issue. *See Smith v. Rosebud Farmstand*, 909 F. Supp. 2d 1001, 1009 (N.D. Ill. 2012); *Cruz v. Primary Staffing, Inc.*, No. 10 C 5653, 2011 WL 1042629, at *1 (N.D. Ill. Mar. 22, 2011).

To support his view of the statute, Mundo leans on the Illinois appellate court's decision in *Gasic v. Marquette Management, Inc.*, 146 N.E.3d 10 (Ill. App. Ct. 2019). There, the court held, by a 2-1 vote, that "under some circumstances, a legal entity, such as a corporation, can act 'personally'" within the meaning of the IGVA. *Id.* at 14.

Granted, in a diversity action such as this, the Court's job is to "apply Illinois law as the Illinois Supreme Court would apply it." *AAR Aircraft & Engine Grp., Inc. v. Edwards*, 272 F.3d 468, 470 (7th Cir. 2001). And, where it has not spoken on an issue, decisions of the Illinois appellate courts are authoritative, unless there is "compelling reason to doubt" that the Illinois Appellate Court has "stated the law correctly." *Id.*

In this case, the Court has compelling reason to doubt that the majority's holding in *Gasic* states the law as the Illinois Supreme Court would. When interpreting an Illinois statute, the "primary objective . . . is to give effect to the intent of the legislature." *In re Madison H.*, 830 N.E.2d 498, 503 (Ill. 2005). "The

best indication of legislative intent is the statutory language, given its plain and ordinary meaning." *People v. Christopherson*, 899 N.E.2d 257, 260 (Ill. 2008).

As the Illinois Supreme Court has recognized, the "plain and ordinary meaning of the term 'person' is an individual human being." *Id.* (cleaned up). And "[i]n Illinois, the general rule is that absent a statutory definition that expands the meaning of person, that term refers to an individual, not a legal entity." *Fayfar v. CF Mgmt.-IL, LLC*, No. 12 C 3013, 2012 WL 6062663, at *1 (N.D. Ill. Nov. 4, 2012) (citing *People v. Christopherson*, 879 N.E.2d 1035, 1037 (Ill. App. Ct. 2007), *aff'd*, 899 N.E.2d 257 (Ill. 2008)).

Nothing in the text of the IGVA suggests that the drafters intended to deviate from this rule. *Robinson*, 2020 WL 586866, at *3. Nor does the Illinois Statute on Statutes suggest as much, given that it provides only that the term 'person' "*may* extend" to legal entities, 5 Ill. Comp. Stat. 70/1.05 (emphasis added), not that it "must or even . . . usually does" so, *Fuesting*, 30 F. Supp. 3d at 743.

That the legislature intended to use the ordinary meaning of 'person' becomes especially evident in view of the surrounding statutory language. For starters, the statute refers to "persons" who "*personally* commit" or "*personally* encourage" gender-related violence. 740 Ill. Comp. Stat. 82/10 (emphases added). While corporations are sometimes considered persons, they cannot be said to act 'personally" because they act only "through their agents." *Rosas*, 2018 WL 3758564, at *3. What is more, the provision in question first refers to a "person who has been s*ubject* to gender-related violence." 740 Ill. Comp. Stat. 82/10 (emphasis added). It is hard to imagine

11

how an artificial entity could be *subject* to gender-related violence. *See Gasic*, 146 N.E.3d at 260 (Schmidt, C.J., dissenting). And since Illinois courts "assign the same meaning to identical words in different parts of the same statute absent clear legislative intent to the contrary," the use of 'person' later on in the same provision should be read to refer only to natural persons as well. *Id.*

Thus, while "the rulings of the state intermediate appellate courts" should generally "be accorded great weight," the Court is compelled to find that *Gasic* does not reflects how the Illinois Supreme Court would rule on the issue at hand. *See State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001). Rather, because the Court believes that the Illinois Supreme Court would agree with its decision in *Robinson*, it grants the City's motion to dismiss with respect to Count IV.

## IV. Conclusion

For the reasons set forth above, the City's motion to dismiss is denied as to Count III, but granted as to Count IV.

**IT IS SO ORDERED.**   ENTERED: 8/3/21

_____
**John Z. Lee**
**United States District Judge**

12