**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES MUNDO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 20 C 2562** |
| | ) | |
| **CITY OF CHICAGO** | ) | |
| **and JANICE HOGAN** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

James Mundo, who identifies as a gay man, is an employee of the Chicago Fire Department (CFD). Mundo has sued the City of Chicago alleging that it failed to take adequate measures to curtail extensive and disturbing sexual harassment to which Mundo was subjected by Janice Hogan, the former Deputy Chief of the CFD's Labor Relations Division, and others in the Department. Mundo asserts a hostile work environment claim under Title VII of the Civil Rights Act of 1964 against the City (count 1); a claim under 42 U.S.C. § 1983 against Hogan for discrimination on the basis of sex, sexual orientation, and gender nonconformity (count 2); a section 1983 claim against the City under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) (count 3); and an Illinois Human Rights Act claim against Hogan (count 5).[1] The City has filed a motion for summary judgment on counts one and three.

---

[1] On August 3, 2021, Judge John Z. Lee granted the City's motion to dismiss count four, a claim asserted against the City under the Illinois Gender Violence Act.

Though Hogan joined in the motion, the motion does not challenge or request summary judgment on counts two and five, the counts asserted against Hogan. The Court therefore construes the motion as seeking summary judgment only on counts one and three against the City. For the reasons set forth below, the Court denies the motion for summary judgment.

## Background

The following facts are undisputed unless otherwise noted.

**A.    CFD**

The CFD is a chain of command organization, with the Fire Commissioner at the top of that chain and career rank paramedics and firefighters at the bottom. Aaron DeCamp, then-General Counsel for the CFD, testified during his deposition that the general expectation is that lower ranked employees follow their superior's orders, with exceptions for orders that they believe are unsafe, unlawful, or unethical.

On April 16, 2012, Jose Santiago became the Commissioner of the CFD and remained in that position until he retired on August 31, 2018 and was replaced by Richard C. Ford III.

The City has a Human Rights Municipal Ordinance that prohibits discrimination and harassment based on sex, gender identity, and sexual orientation. The ordinance also prohibits retaliation for reporting such discrimination or harassment. The City also has a sexual harassment policy that describes the kind of conduct that is prohibited and the procedures an employee may follow to report an incident of sexual harassment. The City's Diversity and Equal Employment Opportunity Division (EEO) similarly has a policy outlining the process for resolution of complaints of discrimination and

harassment brought by City employees, which it oversees.  That policy states that complaints concerning CFD employees must be made in accordance with the CFD's General Orders.  The CFD itself also has a sexual harassment policy and procedure. That policy states, in part, that complaints:

> can be made to CFD supervisors, CFD's EEO Liaison (the Deputy Commissioner of CFD Human Resources), or the City of Chicago's Department of Human Resources or through the appropriate union procedure, any complaint must be promptly forwarded by any CFD supervisor to the City of Chicago's Equal Employment Opportunity Office or the Department of Human Resources, and liaisons must also promptly report any conduct which may constitute harassment or retaliation promptly, even if such conduct is not the subject of a formal complaint.

Defs.' LR 56.1 SOF ¶ 16 (quoting Ex. B - Stipulation I, ¶ 13).

Fire Academy candidates receive training on matters involving sexual harassment and discrimination when they go through the Academy.  In Hogan's approximately seven years as Deputy Chief of the CFD's Labor Relations Division (LRD), she attended a single, one-hour sexual harassment training session as well as one online ethics training session.

## B.  Mundo's employment and early complaints of harassment

In August 2006, Mundo began his employment with the CFD as a firefighter/paramedic.  In January 2008, Mundo moved from his field-based position to an office-based role as an investigator in the CFD's Internal Affairs Division (IAD), where he remained until January 2013.  While working in IAD, Mundo reported to Steven Malec, the Assistant Commissioner of Internal Affairs.  Malec also identifies as a gay man and has been employed by the CFD for almost thirty years.

At some point during his tenure in IAD—it is unclear exactly when—Mundo told Malec that he experienced homophobic harassment while working as a firefighter/EMT

3

at Engine 112.  Some of the instances of harassment that Mundo described during his testimony included: seeing gay pornography taped to lockers of those suspected to be gay; homophobic slurs being used in his presence to describe gay people; witnessing a crew refuse to help a transgender person on a medical call and being harassed for helping the person himself; crew members making comments about his familiarity with the gay bars in a particular area to which the crew was called; witnessing a crew member refuse to render aid to someone inside a gay bar named Roscoe's; and crew members arguing with each other about having to sleep next to Mundo because he is gay.

Malec testified during his deposition that, in response to Mundo's disclosure, he informed Mundo that the time frame during which he could have made a formal complaint about the harassment had passed and that he would therefore not achieve any satisfaction from filing a complaint now.  Malec also testified that the reason Mundo moved from the field to an administrative position in IAD was because "[h]e was having trouble at the firehouse.  Everyone was harassing him."  Malec Dep. 60:4-5.  A person to whom the parties refer as "Chief Ciara" was also present for the conversation between Mundo and Malec regarding the harassment that Mundo reported experiencing.  Malec also testified that both Chief Ciara and whoever was serving as the Fire Commissioner at that time "knew what was going on," *id.* at 71:15-17, regarding Mundo's "difficult[ies] at the firehouse." *Id.* at 60:18-19 and 72:1.

Also during his tenure in IAD, Mundo reported to Malec that, despite his refusals, a coworker named Michelle Coco had repeatedly asked Mundo if he or his husband Dave would provide her with their sperm because she wanted to get pregnant.  Mundo

testified that he could not recall exactly when the complaint was made or what Malec said in response.  Mundo further testified that he did not know if Malec did anything to address his complaint.

**C.    Mundo begins working with Hogan**

In January 2013, Mundo moved from his position in IAD to a position in LRD. Mundo remained in that position until he went on a medical leave of absence in October 2018.  Mundo has not returned to work following his leave of absence but remains a CFD employee.

The reasons behind Mundo's move to LRD are somewhat disputed.  The parties seemingly agree that there were discussions among City administrators—Mundo contends it was the Mayor; the City contends it was the Budget Office—about moving uniformed members such as Mundo who were working in administrative positions back out into the field.  Deputy Fire Commissioner Anthony Vasquez recommended to then-Commissioner Santiago that Mundo be transferred to LRD rather than back to the field because LRD was short staffed.  Mundo contends that Hogan specifically asked for him to be transferred to LRD, but Hogan testified during her deposition that she did not recruit Mundo to LRD.  In his declaration, Malec stated that he supported Mundo in finding another administrative position when "his position was eliminated within Internal Affairs," because of Mundo's "fears of working in the firehouse."  Malec Decl. ¶ 7.

While in LRD, Mundo was supervised by Hogan, who was the then-Deputy Chief of LRD.[2]  Hogan reported to Deputy Commissioner Vasquez.  Because Hogan was a

_____

[2] Hogan held the position of Deputy Chief of LRD from December 2011 to November 1, 2018.

higher ranking command level officer than Mundo, he was generally—subject to some exceptions—required to obey Hogan's orders or face possible discipline. Hogan assigned Mundo his day-to-day tasks and responsibilities. As an officer, Hogan could recommend discipline for Mundo and also had the ability to directly initiate an investigation against him. Hogan also had authority to issue oral warnings to Mundo or other lower-ranking officers without approval from a higher-up. Suspensions and terminations, however, required the Commissioner's approval.

Mundo's position in LRD did not have a job description, was not on the CFD's organizational chart, and was not a regularly budgeted position. Mundo testified that his duties were "whatever [his] supervisor asked of [him]." Mundo Dep. at 30:17. In addition to his official LRD duties, Mundo also performed a number of personal tasks for Hogan at her request.[3] Mundo testified that he felt submissive to her and that he was essentially always at her beck and call. Regarding his belief about whether he needed to do what Hogan asked of him, Mundo testified that "there was always the threat of returning [him] back to Engine 112. Would [he] rather walk to Chase Bank at Martin Luther King Drive or would [he] rather be back at the -- back at the fire house." *Id.* at 351:6-10.

## D.    Mundo's official complaint

On October 5, 2018, Mundo and his husband Dave met with Malec over lunch. During their meeting, Mundo handed Malec a six page, typed document listing a

---

[3] These tasks included, among other things: washing and putting gas in her car, doing her personal banking, returning clothes she had purchased, overseeing the repair of her vacuum cleaner and washing machine, researching retirement homes and treatments for varicose veins, taking pictures of her for her online dating profile, and driving her to meetings, doctor's appointments, malls, and other locations.

number of instances of sexual harassment that he said he had experienced at Hogan's hands. Malec stated in his declaration that Mundo was crying as he presented this information and that said he was terrified of going back to the firehouse.

The document was submitted into evidence as Exhibit 2 to Mundo's Local Rule 56.1(b)(3) Statement of Additional Material Facts. The entries range from October 1, 2016 to October 11, 2018. The reported incidents include, among other things: Hogan repeatedly asking Mundo to have sex with her and to masturbate in front of her (and on one occasion, onto her phone); hitting Mundo over the head; undressing in front of him at least twenty times; making comments about her genitalia and comparing it to a flower; saying that she and Mundo would be perfect together if he wasn't gay; using homophobic slurs; saying that she needed to "get laid"; and threatening to send Mundo back to the field if he didn't comply with her demands.

Regarding other instances of harassment, it is undisputed that Deputy Commissioner Vasquez made a homophobic comment to Mundo in Hogan's presence while the two were studying for a paramedic competency test in Hogan's office. Vasquez made a statement along the lines of, "I can't believe you like sucking dick. You don't like women?" Mundo Dep. 191:5-193:6. Another employee named Sharisse Grassmuck referred to Mundo as "Adam's girlfriend" more than twenty times, and when Hogan heard Grassmuck refer to Mundo in that manner, she would laugh.

On October 9, 2018, Mundo began his medical leave from CFD. Though Mundo alleges that his leave was necessitated by the emotional distress that Hogan's harassment caused him, the City contends there is no evidence to support that allegation.

**E.     Remedial action post-October 2018 complaint**

Sometime after concluding his lunch meeting with Mundo, Malec reported Mundo's complaint to Commissioner Ford.  Commissioner Ford notified Hogan's supervisor, Deputy Commissioner Vasquez, of the same.  Malec also reported the complaint to Mark Pando in the EEO Division.  Commissioner Ford determined that Hogan could remain in her senior management position until the conclusion of the investigation into Mundo's allegations, subject to some restrictions.

On November 1, 2018, Deputy Commissioner Vasquez and DeCamp (the CFD's general counsel) met with Hogan to inform her of Mundo's complaint.  Hogan admitted that she made the sexual comments she was accused of making and that they were inappropriate.  Deputy Commissioner Vasquez and DeCamp told Hogan that she could remain in her position—subject to some modifications—throughout the course of the investigation.  Hogan asked, however, to return to her career service rank of firefighter/paramedic.  Deputy Commissioner Vasquez granted that request, which resulted in Hogan's tenure in the LRD ending that same day.

On December 10, 2018, individuals in the EEO Division interviewed Mundo about his allegations.  The EEO Division also interviewed Hogan and seven other witnesses. Over a year and one-half later, on July 10, 2020, the EEO Division sent the results of its investigation to Commissioner Ford.  The EEO Division sustained Mundo's allegations, determining that there was sufficient evidence to conclude that Hogan had engaged in sexual and sexual orientation harassment in violation of the City's EEO policy.  The EEO Division recommended that Hogan receive a 60 day suspension.

Commissioner Ford agreed with the recommendation, stating that Hogan

8

"violated the very policies she was responsible for educating others on" and had engaged in "willful ignorance of the policies." Pl.'s LR 56.1(b)(3) SOF, Ex. 14. Hogan did not begin serving her suspension until almost seven months later, on January 29, 2021. Pando testified during his deposition that he would agree with the characterization of the time lag between Mundo's complaint and Hogan's suspension as "justice delayed." Pando Dep. at 105:12-14 ("Q: . . . Would you say that that's justice delayed? A: Yeah, I would say it's delayed.").

## F. Pre-October 2018 conduct and complaints

Prior to making his official complaint in October 2018, Mundo made other complaints about Hogan's conduct to Malec. Specifically, Mundo made numerous complaints to Malec about Hogan being excessively clingy, calling him at all hours, and constantly wanting to know where he was. Malec testified during his deposition that Mundo complained about Hogan calling him while she was taking a bath and drinking wine. Mundo contends that this occurred more than once, but Malec testified that he only recalled one such complaint. Malec further testified that at the time—though he now views Mundo's pre-October 2018 complaints in a different light—he did not believe these complaints triggered an obligation to report Hogan up the chain of command, so he did not do so. See Malec Dep. at 94:10-11 ("Thinking back now, yeah, [I] probably should have said, you know, this should be reported. But it is what it is.").

In his declaration, Malec stated that he observed that:

> Janice Hogan was not shy or timid and when in some verbal discussions she showed that when needed she could fit in with the male locker room mentality that existed at the Chicago Fire Department. For instance I have heard Janice Hogan use words including shit, fuck, asshole, dick, pussy, cock, fucker, jagoff, suck, masturbate, cocksucker. On some occasions the discussions may have related to an investigation we were working on

9

but on other occasions the language was regarding her private life.

Malec Decl. ¶ 15(b).  Malec further stated that Hogan would tell sexual jokes and make comments that included sexual innuendos, show him her toenail polish and other parts of her body, and openly discuss her sex life.  Malec also stated that Mundo "complained to [him] that he was afraid he was going to be sent back to a firehouse if he didn't do everything Hogan wanted."  *Id*. ¶ 16(i).

### G.    The CFD's culture and environment

Malec stated in his declaration that "[t]here is a culture of sexual talk, banter and harassment at the CFD even at Headquarters.  Because of this culture most employees are reluctant to report their harassment and instead just try to deal with it on their own."

*Id*. ¶ 19(j).  Malec further stated that:

> The City has a poor and inconsistent record of disciplining CFD members
> that report sexual harassment . . . .  It is not uncommon and even the
> culture at CFD for members to just take the abuse because it is better
> than the alternative of getting ridiculed and/or having supervisors never
> trust you again.  There is an unwritten, Code of Silence that is well known
> within the ranks of the CFD and if someone breaks that Code, you would
> for-ever be labeled as a snitch and not a team player.

*Id*. ¶ 20(b), (h).  Malec testified during his deposition that—based on his twenty-eight years with the CFD and things that he heard from others at the chief level—his opinion was that being labeled as a snitch involved "[being] labeled for the rest of your life on the Fire Department.  And God forbid you need somebody's help in an emergency, you may not get it."  Malec Dep. 206:24–207:2.

Hogan similarly acknowledged during her deposition that she felt that there was an unwritten rule that violations should not be reported because "you could end up being retaliated against."  Hogan Dep. at 81:20-82:11.  Hogan further testified that it

was her belief that "women in the fire department are concerned with complaining about sexual harassment generally." *Id.* at 76:2-5. When asked why she made that statement, Hogan testified that nobody "liked" IAD, that it could "potentially be unnerving" to "open yourself up to sitting with an IAD investigator," particularly "if it's a female and a male." *Id.* at 78:2-9. She further testified that "there's a saying, 'tell a fireman, tell a phone,' so everyone potentially -- if it's made public knowledge, it's a difficult situation." *Id.* at 78:12-15.

## H. *Doe* case

In 2018, the CFD was the subject of another sexual harassment-related lawsuit in this district, *Doe v. City of Chicago*, 18 C 3054 (N.D. Ill. 2018). In *Doe*, several female paramedics accused the City of having a pattern or practice of allowing pervasive sexual harassment, gender discrimination, and retaliation to occur within the Department. Several witnesses were deposed regarding the *Doe* plaintiffs' allegations. During his deposition as part of discovery for that case, Field Chief Patrick Fitzmaurice testified to feeling that the sexual harassment liaison—the person to whom the plaintiffs were meant to report their alleged harassment—would not do anything because she was "there to cover it up; make it go away, not to deal with it." Pl.'s LR 56.1(b)(3) SOF, Ex. 5 at 162:2-3.

In addition, the CFD's then-Discipline Officer, Chief Hogan—a different person from defendant Hogan—testified that a 2014 sexual harassment complaint made by a woman named Robin Alvarez against Ambulance Commander George Bedon—who was the subject of some complaints at issue in the *Doe* case—was not investigated. Chief Hogan also testified to seeing pornography daily in the field.

Ambulance Commander Maggie Murphy testified that, after she filed a sexual harassment grievance in 2014, it "was never touched again. They never followed up." Pl.'s LR 56.1(b)(3) SOF, Ex. 6 at 119: 17-23. Jane Doe 2 testified that a CFD social worker discouraged her from continuing an order of protection against the person she alleged harassed her because something like that "could really ruin his career." Pl.'s LR 56.1(b)(3) SOF, Ex. 7 at 190:17-19. An e-mail chain was also introduced in the case in which Malec received a complaint from a firefighter/paramedic named Barbara Muse with the subject: "Sexual Harassment/Discrimination and Retaliation." Minutes later, Malec forwarded Muse's e-mail to the person she had accused of harassment with the message, "FYI." Pl.'s LR 56.1(b)(3) SOF, Ex. 9. Finally, according to a declaration submitted by Jane Doe 2, a sign hanging in Engine 72's firehouse states: "What you see here, what you say here, what you hear here, stays here when you leave here." Pl.'s LR 56.1(b)(3) SOF, Ex. 13.

## I. OIG audit

After the CFD was the subject of multiple discrimination and sexual harassment lawsuits, the City's Office of the Inspector General (OIG) audited the CFD's policies and practices related to discrimination and sexual harassment. On April 14, 2021, the OIG published the findings from its audit. The OIG's report stated, in part, that:

- Notwithstanding their compliance with federal, state, and local laws—CFD's polices, practices and training were insufficient to meet the unique challenges of CFD's workplace, environment and culture.
- CFD's workplace environment and culture had the potential to make some members vulnerable to discrimination and sexual harassment.
- The EEO Division's mandatory training was "not adequately tailored to serve the needs" of CFD's "command and control structure, unique aspects of CFD's workplace, and tension arising from its history of overt racial and gender discrimination." Pl.'s LR 56.1(b)(3) SOF, Ex. 4 at 4.
- "CFD's complaint reporting and investigation initiation procedures lacked

privacy and left members vulnerable to retaliation." *Id*. at 5. "[F]ear of retaliation and concern that speaking up would cost one's career were two of the most common reasons CFD chose not to file discrimination or harassment complaints." *Id*.

- CFD needed to "develop a strategy to include more safeguards to protect reporting members and victims from potential retaliation." *Id*.
- The organization culture at CFD "plays a part in creating and sustaining norms and practices that can harm certain demographic groups." *Id*. at 7.
- CFD follows a strict chain of command structure with defined ranks. The Department sets clear expectations and responsibilities for members—an especially critical aspect of emergency operations—and gives superiors considerable power and responsibility. Lower ranks must follow orders." *Id*. at 11.

## J.     Mundo sues

On April 27, 2020, Mundo sued Hogan and the City for various claims stemming from his alleged sexual harassment. The City has now filed a motion for summary judgment on all claims brought against it.

## Discussion

## A.     Preliminary matters - Local Rule 56.1

The City argues that the Court should disregard portions of Mundo's Local Rule 56.1 filings as improper. Regarding Mundo's responses to the City's statement of facts, the City contends that Mundo fails to properly dispute certain facts or accurately cite the record for support. The City also contends that Mundo improperly asserts additional facts in his responses to the City's undisputed facts. The City further contends that Mundo inappropriately includes legal conclusions, argumentation, and hearsay in his statement of additional facts that cannot be considered by the Court.

The Court agrees that some of Mundo's facts and responses are inappropriately conclusory, lack adequate or accurate citation to the record, or are unresponsive to the City's statements of fact. It is not necessary, however, for the Court to determine

exactly which statements should not be relied upon on summary judgment. Where appropriate, the Court notes what evidence it relies upon in making its decision and ignores evidence that fails to comport with the requirements of the Local Rules.

## B.    Count one – Title VII claim

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Mundo contends that the City violated Title VII by failing to take appropriate action to address the hostile work environment created by Hogan's sexual harassment. *See Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008) ("Hostile or abusive work environments are forms of sex discrimination actionable under Title VII of the Civil Rights Act of 1964.").

To avoid summary judgment, Mundo must provide evidence from which a reasonable jury could find that his work environment was both objectively and subjectively offensive; the conduct was either severe or pervasive; it was based on his membership in a protected class; and there is a basis for employer liability. *Vance v. Ball State Univ. (Vance I),* 646 F.3d 461, 469 (7th Cir. 2011). The City contends that Mundo has not established a basis for employer liability, and that even if there were such a basis, the City has a viable *Faragher/Ellerth* affirmative defense that entitles it to summary judgment.

### 1.    Employer liability

The City contends that Mundo has failed to establish that there is a basis for

14

employer liability, as Hogan was not Mundo's supervisor for purposes of Title VII. To determine whether there is a basis for employer liability, the Court must determine first "whether the alleged harassment was perpetrated by supervisors or coworkers." *Vance I*, 646 F.3d at 469. If Hogan was Mundo's supervisor, then the City "is strictly liable for his harassment," subject to certain affirmative defenses. *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017); *see also*, *Vance v. Ball State Univ*. (*Vance II*), 570 U.S. 421, 428 (2013) (describing affirmative defenses). But if Hogan was simply a coworker, the City "is liable only if it was negligent either in discovering or remedying the harassment." *Nischan*, 865 F.3d at 930 (internal quotation marks omitted).

The Supreme Court has explained that the controlling definition of a supervisor for the purposes of Title VII is an employee "empowered . . . to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance II*, 570 U.S. at 431 (internal quotation marks omitted). Under the controlling definition from *Vance II* and governing Seventh Circuit caselaw, no reasonable jury could find that Hogan was Mundo's supervisor.

Mundo attempts to confront the fact that Hogan did not officially possess power to hire, fire, promote, demote, or transfer him by arguing that Hogan *effectively* had such power. Specifically, Mundo contends that Hogan effectively had such power because she directed his day-to-day duties, dictated virtually all aspects of his working conditions, and had the authority recommend discipline against him. Mundo also

contends that Hogan could effectively remove him from his position because she had the ability to reassign Mundo subject only to a rubber stamp-type approval from Deputy Commissioner Vasquez, who would automatically accept such a recommendation from Hogan.

Under binding Circuit precedent, Hogan's ability to control Mundo's working conditions and/or recommend discipline are insufficient for the purpose of establishing employer liability under Title VII. *See Ortiz v. Werner Enters., Inc*., 834 F.3d 760 (7th Cir. 2016) (individuals were not "supervisors" even though they managed assignments, investigated complaints, and made disciplinary recommendations); *see also, Andonissamy v. Hewlett-Packard Co*., 547 F.3d 841, 848 (7th Cir. 2008) (holding ability to direct performance and recommend discipline is not sufficient to be a supervisor); *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004) (finding harasser who managed assignments, investigated complaints, and made discipline recommendations was not a supervisor).

Regarding Mundo's latter contention, there is no evidence that Hogan's disciplinary recommendations gained automatic approval; in fact, there is some evidence in the record to the contrary. For example, Deputy Commissioner Vasquez testified that, although Hogan "could have recommended [discipline]. It doesn't provide that it would be sustained." Vasquez Dep. at 46:3-10. Moreover, it is undisputed that all suspensions and terminations required the Commissioner's approval.

In *Velez v. City of Chicago*, 442 F.3d 1043 (7th Cir. 2006), the Seventh Circuit squarely addressed the question of Title VII supervisory liability for hostile work environment claims as applied to the CFD's command structure. The Seventh Circuit

16

held that, although the plaintiffs' commander had the authority to oversee aspects of their employment, he was not their supervisor for Title VII purposes because he could not *directly* affect the terms and conditions of their employment. Specifically, the court concluded that only the Commissioner had the final authority to hire, fire, demote, transfer, or discipline the plaintiffs, not their commander. Similarly, here, both Commissioner Santiago and Commissioner Ford testified during their depositions that Hogan did not have the authority to hire, fire, demote, transfer, or discipline. Hogan could only recommend such actions to Deputy Commissioner Vasquez, who would then pass the recommendation along to the Commissioner for a final decision. *Velez* is therefore binding and precludes Mundo's contention that Hogan was his supervisor for Title VII purposes.

Mundo relies primarily on *Kramer v. Wasatch County Sheriff's Office*, 743 F.3d 726 (10th Cir. 2014), but unlike *Velez*, *Kramer* is both non-binding and factually distinguishable. As the City correctly points out, unlike Hogan, the sergeant in *Kramer* had the authority to directly take tangible employment actions including suspensions, reassignments, transfers, and relief from duty. The Tenth Circuit also noted the fact that the County had characterized the sergeant as a supervisor, but the Seventh Circuit has "consistently distinguished employees who are supervisors merely as a function of nomenclature from those who are entrusted with actual supervisory powers." *Parkins v. Civil Constructors*, 163 F.3d 1027, 1033 (7th Cir. 1998); *see also*, *Velez*, 442 F.3d at 1047 ("[The] term [supervisor] has a specific meaning for purposes of Title VII.").

Without the ability to directly hire, fire, demote, transfer, or discipline, Hogan simply does not qualify as a supervisor for purposes of Title VII under the current Circuit

precedent.  Because no reasonable juror could find that Hogan was Mundo's supervisor, the need for the City to assert an *Ellerth/Faragher* affirmative defense is not triggered.

### 2.    Negligence

When, as in this case, a hostile work environment is claimed to have been created by a non-supervisor, the employer is liable only if it was negligent in discovering or remedying the conduct.  *Rhodes*, 359 at 505-06.  The Court must therefore assess whether Mundo has produced evidence from which a reasonable jury could conclude the City was negligent in its response to Mundo's complaints of a hostile work environment.  *See Nischan*, 865 F.3d at 930.  The Court concludes that he has.

The City contends that the fact that it "took prompt and effective remedial action is dispositive."  *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 813 (7th Cir. 2022).  It also contends that "[a]n employer's legal duty in co-employee harassment cases will be discharged if it takes 'reasonable steps to discover and rectify acts of sexual harassment of its employees.'"  *Parkins v. Civ. Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998) (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997)).  The City is correct that an employer can avoid liability for harassment by taking "prompt and appropriate corrective action *reasonably likely to prevent the harassment from recurring*."  *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009) (emphasis added).  But there are disputed questions of fact regarding how "prompt," "effective," or "reasonable" the City's actions were vis-à-vis sexual harassment at the CFD, and certainly regarding the likelihood that those actions would prevent harassment from recurring.

A reasonable jury could find that the City promptly and effectively reported Mundo's first *official* complaint up the chain of command shortly after it was made in October 2018.  Malec reported the complaint to Commissioner Ford, who then notified Deputy Commissioner Vasquez.  Malec also reported the complaint to the EEO Division.

But a reasonable jury could also come to the opposite conclusion.  Deputy Commissioner Vasquez and DeCamp did not sit down with Hogan until a month after Mundo made his official complaint, and in the interim they allowed her to remain in her then-current position.  After their interview, Vasquez and DeCamp allowed Hogan to move back to her career service rank of firefighter/paramedic despite her admission that she had engaged in some of the conduct that Mundo accused her of.  Moreover, the EEO Division did not begin conducting interviews of the parties and witnesses until another month after that (December 2018).  Nor did the EEO Division complete its investigation until over a year and one-half later, on July 10, 2020.  And despite Commander Ford's statement that he found Hogan's conduct to be "egregious," she did not serve her suspension until almost seven months later, on January 29, 2021.  Finally, although Hogan and Mundo ceased working together the very same day he made his complaint to Malec, a reasonable jury could find that was due to Mundo taking medical leave, not any remedial action on the City's part.

There is also ample evidence of Mundo's *pre*-October 2018 complaints to Malec and of Malec himself having witnessed some of Hogan's inappropriate behaviors.  While working in IAD, Mundo disclosed harassment to Malec that was unrelated to Hogan,

namely, the harassment he experienced at Engine 112[4] and the incident with Michelle Coco asking Mundo for his sperm. The City contends it cannot be considered to have been aware of those prior complaints or issues because they did not make their way through the City's formal complaint process until October 2018. It further contends that "there is no evidence that Vasquez had any reason to know of the alleged harassing behavior until Plaintiff's October 2018 complaint." Defs.' Mot. for Summ. J. at 9.

But Mundo has offered enough evidence to permit a reasonable jury to find that the City was sufficiently apprised of the problem, notwithstanding the existence of its formal complaint procedure. *Rhodes*, 359 F.3d at 506 (an employer is considered to have constructive notice of a hostile work environment "where the harassment was sufficiently obvious."). Mundo has offered ample evidence about an overall culture of harassment at the CFD and the dozens of instances of harassment to which he was subjected to by Hogan, many of which were in the presence of others.

As outlined above in the "Background" section of this opinion, there is also ample evidence that would permit a finding that reporting harassment and discrimination was actively discouraged within the CFD, that the CFD's formal reporting process is flawed, and that sexual harassment and discrimination training within the CFD was lacking. According to the EEO investigation, Mundo started documenting Hogan's behavior as early as November 2016 but did not make a formal complaint until October 2018 for fear of retaliation and because he indicated Hogan had blackmailed him. That evidence is

---

[4] There is also evidence to suggest that another CFD member, "Chief Ciara," and the then-Fire Commissioner were aware of the harassment Mundo experienced at Engine 112.

bolstered by the results of the OIG audit and testimony from the *Doe* case.[5]

Moreover, Mundo claims to have been victimized by the same conduct, or at least the same sort of conduct, that was directed generally at gay and gender-nonconforming people in the Department. A reasonable jury could find that the pervasiveness of activity that by its very nature targeted all gay and gender-nonconforming workers in CFD was sufficient to establish constructive notice to the City as to claims by particular workers. Finally, the City's contention regarding Deputy Commissioner Vasquez's lack of knowledge is unavailing given its concession that Vasquez *himself* engaged in at least one of the instances of allegedly harassing behavior at issue in this case. *See supra* at 7.

Thus, the fact that the City had sexual harassment policies and procedures in place—and that they were deployed in Mundo's case—does not obviate the genuine factual dispute arising from the other record evidence of the City's negligence regarding workplace harassment. The Court therefore denies the City's motion for summary judgment on count one.[6]

---

[5] Under Federal Rule of Evidence 408, the City disputes the use of the settlement in *Doe* to establish negligence in this case. But the Court is not considering the fact that *Doe* resulted in a settlement as evidence of negligence. Rather, the Court considers only the underlying record evidence offered in that case. *Levy v. Wilkie*, 841 F. App'x 987, 994 (7th Cir. 2021) ("'But we have noted that deposition testimony from previous cases can be used at summary judgment just as affidavits can.'") (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014)).

[6] The City also contends that, to the extent that count one asserts a discrimination claim, it is entitled to summary judgment because Mundo has not offered evidence that he was subjected to an adverse employment action as required by such a claim. But as clarified in Mundo's response, count one asserts a claim of hostile work environment—not discrimination—so no showing of an adverse employment action is required. The Court therefore need not discuss the City's contention further.

**F.     Count three – *Monell* claim**

"To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that he or she was deprived of a right secured by the Constitution or the laws of the United States, and that this deprivation occurred at the hands of a person or persons acting under the color of state law." *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015). Section 1983 claims against municipalities, or *Monell* claims, require a plaintiff to show that she was "deprived of a federal right, as a result of an express municipal policy, widespread custom, or deliberate act of a decision-maker for Cook County, which proximately caused his injury." *Davis v. Carter*, 452 F.3d 686, 691 (7th Cir. 2006); *see also Monell*, 436 U.S. 658.

In general, section 1983 claims alleging equal protection violations due to sexual harassment "follow[] the contours of Title VII claims." *King v. Bd. of Regents of Univ. of Wis. Sys.*, 898 F.2d 533, 537 (7th Cir. 1990). One difference between the two claims, however, is that on an equal protection claim, "the defendant must intend to harass," whereas that is not required under Title VII. *Id.* Intent can be demonstrated by evidence of deliberate indifference, or evidence of officials' "aware[ness] of the risk created by the custom" and their "fail[ure] to take appropriate steps to protect" Mundo from it. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010); *see also*, *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) ("The Supreme Court has defined deliberate indifference in this context to mean that a reasonable policymaker [would] conclude that the plainly obvious consequences of the City's actions would result in the deprivation of a federally protected right.") (internal quotation marks omitted).

22

Mundo does not contend that the City had an express policy whose enforcement was unconstitutional or that a person with final policymaking authority caused him to suffer a constitutional injury. Instead, he contends that the City had a widespread practice or custom of permitting sexual harassment and discrimination based on sexual orientation and gender non-conformity. The City contends that "sexual harassment was not condoned as a cognizable, well-settled custom or practice" and that it was not deliberately indifferent to the known or obvious consequences of its inaction vis-à-vis harassment in the Department. Defs.' Mot. for Summ. J. at 12.

As with its challenge to Mundo's Title VII claim, the City largely focuses on the fact that its employees are protected by multiple layers of policies and procedures aimed to prevent and penalize sexual harassment. It cites to four other complaints of sexual harassment that were investigated by the EEO Division during the relevant period and the fact that discipline was administered on all of them.

But as the City states, this evidence might "*undermine*[] [Mundo's] theory of a department that is complacent to and condones sexual harassment," but whether and to what extent that evidence dooms Mundo's *Monell* claim is a question for the jury. *Id.* at 13 (emphasis added). As noted above, Mundo has offered ample evidence that would permit a reasonable jury to conclude that the City was aware of a pattern of allowing its members to sexually harass and discriminate against gay and gender-nonconforming people, notwithstanding its written policies to the contrary. In particular, given the evidence that the CFD suppressed or discouraged the reporting of incidents, a reasonable jury could find that any figure that the City provides to show that reports of harassment were made and properly investigated by the EEO Division underestimates

23

the true number of incidents.

Mundo contends that, not only was he subject to severe and persistent harassment by Hogan and others at the CFD, but other employees were as well because the Department's culture and environment allowed harassment to flourish and discouraged anyone from reporting it.  Mundo offers, among other things, his own deposition testimony, the EEO Division's investigative report, Malec's deposition testimony and affidavit, deposition testimony and affidavits from the *Doe* case, and the OIG's findings from its audit of harassment and discrimination at the CFD.  There is evidence that investigations (including Mundo's) were often delayed, that employees were discouraged from reporting, and that the CFD often offered those accused the opportunity to resign or move to another position of their choice rather than face discipline.  For example, Mark Pando of the EEO Division testified during his deposition that, even for reports of harassment that he thought warranted termination, he would not recommend termination if he believed it would not be upheld on an appeal brought by the employee.  He further testified that:

> [I]f we were in a non-union setting or non-career service setting, you know, if somebody, you know, engages in even like small infractions, most employers would terminate those – those individuals who engage in the violations. And -- and unfortunately here at the City, we -- we can't just terminate employees because, again, it's -- it's -- the standard's gonna be very high for us to try to prove that they should be terminated.

Pando Dep. at 160:17-161:4.  Malec also testified during his deposition that he was aware of instances "where someone complained about sexual talk or banter and their complaint was ignored."  Malec Dep. at 160:18-20.  He further testified:

> The latest one is probably the most noteworthy with all the -- this sexual harassment and gender-based Jane Doe complaints.  Half of those were ignored by the bosses.  Some of the conduct was committed by their

24

> bosses.  I got 28 years of knowledge of things that happened, complaints
> that were made and complaints that were initially ignored and then
> investigated.  So, yeah, it happened -- happens.

*Id.* at 160:23-161:7.  Indeed, as stated earlier, Mundo presented evidence that Malec

*himself* did not act on complaints of harassment that Mundo brought to him prior to

October 2018.  And when Malec was asked if he had any reason to believe that

Commissioner Santiago would have tolerated a homophobic atmosphere at the CFD,

he replied, "[d]epends who it was and if he could get away with it."  *Id*. at 127:19-20.

There is also evidence that the City provided only minimal training on preventing

and reporting sexual harassment and discrimination.  See *City of Canton v. Harris*, 489

U.S. 378, 390 (1989) (stating that deliberate indifference can be found when "the need

for more or different training is so obvious, and the inadequacy so likely to result in the

violation of constitutional rights").  Jane Doe 1 from the *Doe* case testified that the

training on sexual harassment at the Academy consisted of someone starting a video

and leaving the room while everyone talked over it.  She further testified that "[n]o one

takes it seriously."  Pl.'s LR 56.1(b)(3) SOF, Ex. 11 at 398:17-24.  And as previously

stated, Hogan herself only attended two sexual harassment or ethics-related training

sessions in her seven years as the Deputy Chief of LRD.

The City makes several arguments about Mundo's inability to identify others who

were harassed and were too fearful to report it, or who did report it and were ignored

and/or retaliated against.  The City also makes arguments regarding the immateriality of

the report from OIG's audit or the *Doe* case.  These arguments are contrary to settled

law regarding how a court considering a summary judgment motion considers evidence

and draws inferences.  "On summary judgment, a court may not weigh the evidence or

decide which inferences should be drawn from the facts." *Costello v. Grundon*, 651 F.3d 614, 636 (7th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "Rather, the court's task is to determine based on the record whether there is a genuine issue of material fact requiring trial." *Id.* In doing so, a Court is required to draw reasonable inferences in favor of the non-moving party—in this case, Mundo—not the other way around. *See, e.g., Johnson v. General Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 727 (7th Cir. 2013). Thus, although Mundo's apparent inability to name names might lead a jury to disbelieve him, it is not an appropriate basis for the Court to discount his testimony when assessing whether summary judgment is warranted. In any event, it is hardly surprising that Mundo may not know the particulars of many other CFD members' personal experience with harassment or the inadequacy of the City's response to it. That is a feature of Mundo's claim, not a bug. Moreover, though the City's attacks on the materiality of the OIG audit report and evidence from the *Doe* case may affect the weight the jury should give that evidence at trial if it is admitted, they do not entitle the City to summary judgment.

In sum, on the record before the Court, a reasonable jury could find that the City knew of the widespread sexual harassment problem occurring in the CFD and was deliberately indifferent to it. Even if the City did have some safeguards in place to address the issue of harassment within the Department, its failure to consistently, promptly, and effectively employ these measures supports a finding of deliberate indifference. At trial, the jury will evaluate the measures that the City adopted and determine whether the City was deliberately indifferent in spite of them. At this stage,

however, all Mundo must show is that there is sufficient evidence for the trier of fact to reasonably conclude that the City's remedial actions were so lacking that they suggest that it was deliberately indifferent to the problem. Mundo has done so.

The Court therefore denies the City's motion for summary judgment on count three.

## Conclusion

For the foregoing reasons, the Court denies the City's motion for summary judgment [dkt. no. 116 & 117]. The case is set for a telephonic status hearing on June 1, 2023 at 9:05 a.m. to set a trial date and discuss the possibility of settlement. The following call-in number will be used: 888-684-8852, access code 746-1053.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: May 18, 2023

27